**Slip Op. 99-50**

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|  |  |  |
|---|---|---|
| BORDEN, INC., GOOCH FOODS, INC. and HERSHEY FOODS CORP., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Consol. Ct. No. 96-08-01970 |
| | : | |
| UNITED STATES and UNITED STATES DEPARTMENT OF COMMERCE, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| DELVERDE, SrL and DELVERDE USA, INC., | : | |
| | : | |
| Defendant-Intervenors. | : | |
| | : | |

_____

[Amended Final determination following remand sustained as to plaintiffs Borden, Inc., Gooch Foods, Inc., and Hershey Foods Corp. and defendant-intervenors Delverde, SrL and Delverde USA.]

Dated: June 4, 1999

Collier, Shannon, Rill & Scott, PLLC (Paul C. Rosenthal, Kathleen W. Cannon, David C. Smith, Jr., and John B. Brew) for plaintiffs Borden, Inc., Gooch Foods, Inc., and Hershey Foods Corp.

Neville, Peterson & Williams (Lawrence J. Bogard), Mound, Cotton & Wollan (Constantino P. Suriano) for defendant-intervenors Delverde, SrL and Delverde USA.

David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Erin E. Powell), Dean Pinkert, Attorney Advisor, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendants

## <u>OPINION</u>

**RESTANI, Judge:** This matter is before the court following remand to the United States Department of Commerce ("Commerce") of <u>Certain Pasta from Italy</u>, 61 Fed. Reg. 30,326, 38,547-01, 42,231-02 (Dep't Commerce 1996) (final and amended final determinations of sales at less than fair value). Familiarity with the court's earlier decision in this case is presumed. <u>See</u> <u>Borden, Inc. v. United States</u>, 4 F. Supp.2d 1221 (Ct. Int'l Trade 1998) [hereinafter "<u>Borden I</u>"]. Issues relating to respondent DeCecco were resolved in <u>Borden, Inc. v. United States</u>, No. 98-167, 1998 WL 895890 (Ct. Int'l Trade Dec. 16, 1998) (remand determination affirmed as to De Cecco). As to the issues remaining, following remand, the court sustains Commerce's <u>Redetermination on Remand</u> [hereinafter "<u>Remand Determination</u>"].

## I. **Targeted Dumping**

### **Background**

Borden asked the court to find that Commerce erred in failing to calculate dumping margins for Delverde by comparing weighted-average normal values to transaction-specific export prices, pursuant to 19 U.S.C. § 1677f-1(d)(1)(B) (1994), the "targeted dumping" provision of the anti-dumping statute. The court remanded to Commerce to continue its targeted dumping

inquiry.  Borden I, at 1248.  On remand, the court required that Commerce either articulate standards by which it would evaluate a targeted dumping petition or, if not yet prepared to do so, that Commerce conduct its own analysis of the data to determine whether to calculate dumping margins for Delverde using transaction-specific rather than weighted-average prices.  Id. at 1229.  The court further instructed that if Commerce chose to articulate the standards by which a targeting petition would be evaluated, the agency was also obliged to clarify the allocation of the analytical burden between petitioners and Commerce.  Id. at 1230.

Commerce chose to articulate the standards by which it would evaluate a targeted dumping petition, explicitly noting that the methodology developed for this case might vary in the future. Remand Determination, at 15.  After receiving comments on its proposed standards, Commerce released its final methodology by letter on July 22, 1998.  Id. at 17.

Commerce defined price difference as a separation in price, defining price as gross unit prices less adjustments for movement charges, discounts, rebates, and post-sale price adjustments. Id. at 16.  Accordingly, if targeting had occurred, the allegedly targeted purchaser would receive a lower average price than each

allegedly non-targeted purchaser, and that price difference would not be attributable to non-targeting factors such as product type, level of trade, time of sale, or terms/conditions of sale. Id.

Commerce defined two ways it would identify price differences significant enough to trigger a targeted dumping investigation. First, to avoid the illogical conclusion that the majority of purchasers were targeted,[1] the price to the allegedly targeted purchaser must be in the lowest 20 percent of all average transaction prices. Id. Second, to determine what magnitude of price differences is significant for the market at hand, Commerce requires that the price separation between allegedly targeted and non-targeted customers must be equal to or greater than the maximum price separation within the non-targeted group, unless a party shows the exporter's data to be non-representative of the industry as a whole. Id.

Commerce also defined which significant price differences would qualify as a pattern. Specifically, the department would recognize a pattern of significant price differences if i) they

---

[1]    By definition, if a petition alleges that the price charged the majority of purchasers is less than fair value, that petition effectively does not allege targeting. Likewise, if the majority of purchasers are sold goods at less than fair value, the risk that weighted-average price comparisons will mask dumping evaporates.

existed, on average, over all relevant time periods and for all products sold by the exporter to the allegedly targeted customer or customers, and ii) average transaction prices exhibited a "downward skewness" with respect to allegedly targeted customers. Id. Commerce noted, in response to comments from the parties, that the department would relax its standards if a party could show that the allegedly targeted purchasers comprised a well-defined group, such as those who buy for a niche market or those who recently changed suppliers due to price-undercutting. Id. at 16-17.

Following Commerce's detailed instructions for identifying customers frequently "at the bottom," Letter from Commerce (July 22, 1998), Attachment, at 1, Borden filed a targeted dumping petition against Delverde on July 27, 1998. Remand Determination, at 17. On the basis of this application, Commerce decided to pursue a targeted dumping investigation of Delverde. Id. In its July 27, 1998 petition, Borden had alleged that all customers "frequently at the bottom" were being targeted by Delverde. Draft Remand Determination on Targeted Dumping (Aug. 20, 1998), at 2 [hereinafter "Draft Redetermination"].

Commenting that this might have been the result of a misunderstanding by Borden, Commerce modified its targeting

inquiry for this single occasion.  Id. at 2-3.  Commerce
considered that the set of purchasers proposed by Borden might be
over-inclusive and might mask actual targeting.  Id. at 3.
Commerce announced that in addition to its targeting analysis of
Borden's data, it therefore also would perform this analysis on a
subset of Borden's purchaser group: those found at the lower end
of that set.  Id. at 3.

On the basis of these calculations, Commerce concluded that
the data did not reveal targeted dumping by respondent Delverde.
Remand Determination, at 17.  Borden here challenges five aspects
of Commerce's Remand Determination.

## Discussion

### a.   Motion to Amend and Exhaustion of Administrative Remedies

Borden makes three arguments which pertain to the targeted
dumping petition it filed under Commerce's methodology announced
during remand.  The court addresses two of these at this point
and the third in a separate section below.  First, Borden alleges
that Commerce erred in its targeted dumping analysis when it
deviated from its normal calculation methodology for determining
net prices by including selling expenses incurred by Delverde.
Second, Borden argues that Commerce incorrectly included customer
category as a control factor in its targeted dumping analysis,

despite a prior finding that all sales were made at the same level of trade. Plaintiffs' Comments on Redetermination on Remand (Sept. 28, 1998), at 9-10 [hereinafter "Plaintiffs' Comments"].

In their response to Borden's comments on the Remand Determination, defendants noted that Borden's argument regarding the inclusion of selling expenses was not raised before the agency. Defendants' Response (Oct. 2, 1998), at 1. Defendants now seek leave to amend their response to raise the same concern with respect to Borden's customer category claim, proposing to argue that Borden failed to exhaust its administrative remedies in failing to raise this question during the administrative stages of the remand.[2] Defendants' Amended Response (Oct. 9, 1998), at 1.

Borden responds with an equitable argument that Commerce should not be permitted to amend its response. Plaintiffs' Opposition to Defendants' Amended Response (Oct. 26, 1998), at 2-3. Borden complains that after the agency had received an

---

[2]    In its response to Borden's and defendants' comments after the Remand Determination, Delverde raised the issue of Borden's failure to exhaust its administrative remedies as to both the selling expense and customer category issues. Thus, the court would be required to address the exhaustion issue, whether Commerce raised it or not. One might argue, however, that Commerce has a more direct interest in the procedural issue.

extension of time amounting to three additional months to submit its remand analysis to the Court, the agency permitted Borden only a few days to respond to each of three statistically-complex stages during the remand.  In particular, the agency required Borden to comment upon its draft redetermination dated Thursday, August 20, 1998, by close of business Monday, August 24, 1998. Id. at 2.  Given this tight schedule, Borden finds unfair Commerce's attempt here to preclude arguments Borden failed to raise in that short period.  Accordingly, Borden specifically requests that the court deny Commerce leave to amend its response to Plaintiffs' Comments to make this preclusion argument in light of the relatively long time Commerce had (11 days) to respond in the first place.

   Borden's response to Commerce's motion compounds the exhaustion issue.  Borden did not make a due process objection or any other kind - to Commerce's response schedule in either its response to Commerce's Draft Redetermination or in Plaintiffs' Comments.  Nor, strictly speaking, does Borden make such an argument here, relying only on its persuasive value in

equity.[3]  The court notes that Commerce has not promulgated regulations specifying certain procedures or timing on remand.

The court is satisfied from the record that as a factual matter, Borden failed to raise either the selling expense or the customer category issue during the administrative phase of the remand.  To the extent they are divisible, the court addresses the motion to amend and the exhaustion issue in turn.

The court considers Commerce's October 9, 1998 motion to amend its response to Plaintiffs' Comments analogous to a motion to amend a pleading.  A party may amend its pleading by leave of court.  USCIT Rule 15(a).  The court has the discretion to grant or deny a motion to amend.  See Saarstahl AG v. United States, 949 F. Supp. 863, 866 (Ct. Int'l Trade 1996), aff'd in part, rev'd in part, 1999 WL 203323 (Fed. Cir. Apr. 12, 1999).  The

---

[3]     Even if the court should consider that Borden unwittingly has raised a due process issue at this belated stage, and even if the court deemed such a due process claim to be viable in an antidumping context, the claim likely would be unavailing to Borden.  The court applies a rule of reason in evaluating administrative due process claims.  See United States v. Islip, 18 F. Supp.2d 1047, 1064-66 (Ct. Int'l Trade 1998) (Customs fraud defendant given seven rather than the required 30 days to respond was not deprived of due process such as would preclude jurisdiction on review because "[d]efendant was ultimately given sufficient opportunity to be heard at the administrative level.") Borden's thoughtful responses to Commerce's proposed methodology and draft redetermination, and Commerce's responses to those detailed remarks in the Remand Determination clearly show that, as a practical matter, Borden was not substantially deprived of an opportunity to be heard before the agency.

Rule provides, in relevant part, that "a party may amend the party's pleading . . . by leave of court," and that "leave shall be freely given when justice so requires."  USCIT Rule 15(a).

The Supreme Court has described the parameters of this discretion.[4]  <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962).  In <u>Saarstahl</u>, 949 F. Supp. at 866, this court denied a motion to amend the complaint because of undue delay and unfair prejudice to the other parties.  By contrast, defendants' motion to amend here cannot be said to be unduly delayed, as it followed almost directly the procedural event (the filing of defendants' response to Borden) it seeks to revise.  None of the other factors listed in <u>Foman</u> suggest that the court must deny defendants' motion.

---

[4]    In <u>Foman</u>, the Supreme Court discussed Fed. R. Civ. Proc. 15(a), which contains the same language and is parallel to USCIT Rule 15(a).  <u>See</u> <u>also</u> <u>Earth Island Institute v. Christopher</u>, No. 95-169, 1995 WL 604708, at *1 (Ct. Int'l Trade Oct. 12, 1995). The Court in <u>Foman</u> stated,

> If the underlying facts or circumstances relied upon by
> a plaintiff may be a proper subject of relief, he ought
> to be afforded an opportunity to test his claim on the
> merits.  In the absence of any apparent or declared
> reason - such as undue delay, bad faith or dilatory
> motive on the part of the movant, repeated failure to
> cure deficiencies by amendments previously allowed,
> undue prejudice to the opposing party by virtue of
> allowance of the amendment, futility of amendment, etc.
> - the leave sought should, as the rules require, be
> 'freely given.'

<u>Foman</u>, 371 U.S. at 182.

That the argument therein may be damaging to Borden does not render the amendment unduly prejudicial.  The court therefore grants defendants' motion and allows the proposed amendment.

The court now turns to the question of exhaustion of administrative remedies as to both the selling expense and the customer category issues.  In the Court of International Trade, the doctrine of the exhaustion of administrative remedies is statutorily based.  28 U.S.C. § 2637 (1994).  With certain enumerated exceptions, the court is instructed that it "shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).

The exhaustion requirement of § 2637(d) is discretionary rather than strictly jurisdictional.  United States v. Priority Products, Inc., 793 F.2d 296, 300 (Fed. Cir. 1986).  The court may decide to waive the requirement and reach an issue not raised before the agency.  Id. (emphasizing the discretionary language in 28 U.S.C. § 2637(d)).

When the court bases its review of an administrative decision on grounds not before the agency, it "deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action."  Budd Co., Wheel & Brake Div. v. United States, 15 CIT 446, 452, 773 F. Supp. 1549,

1554 (1991) (citing Unemployment Compensation Comm'n of Alaska v.
Aragon, 329 U.S. 143, 155 (1946)).  Accordingly, the court will
not hear an issue a party failed to raise during the
administrative process where that issue does not fall within one
of the recognized exceptions to the exhaustion doctrine.  See
Federal-Mogul Corp. v. United States, 18 CIT 785, 803-04, 862 F.
Supp. 384, 402 (1994) (issue excluded for failure to exhaust
where no exception to exhaustion requirement permits the court to
entertain the argument).

One aim of the exhaustion doctrine is to give the agency a
chance to address the issue before the court considers it.[5]
McKart v. United States, 395 U.S. 185, 194 (1969); see also
Mitsubishi Heavy Indus., Ltd. v. United States, 15 F. Supp.2d
807, 821 n.6 (Ct. Int'l Trade 1998) (permitting party to raise
issue despite failure to exhaust where agency had "ample
opportunity to respond to th[e] question at the administrative
level").

The majority of the cases collected in Budd, 15 CIT at 452
n.2, illustrating exceptions to the exhaustion doctrine,

---

[5]    Other purposes include giving effect to the agency's
governing statute, permitting the agency to make a record,
respect for agency expertise and discretion, administrative
efficiency in discouraging parties from seeking interlocutory
review, and respect for administrative autonomy.  McKart, 395
U.S. at 193-95.

represent instances where this purpose would not be effected by strict application of the doctrine.  See, e.g., Rhone Poulenc, S.A. v. United States, 7 CIT 133, 136, 583 F. Supp. 607, 611 (1984) (recognizing that plaintiff raised new, purely legal argument requiring no further agency involvement); Timkin Co. v. United States, 10 CIT 86, 92-93, 630 F. Supp. 1327, 1334 (1986) (reasoning that an intervening judicial interpretation following remand changed the result); Rhone Poulenc, 7 CIT at 135, 583 F. Supp. at 610-11 (considering that an administrative challenge asking the agency not to apply its regulation would have been futile); Philipp Bros., Inc. v. United States, 10 CIT 76, 80, 630 F. Supp. 1317, 1321 (1986) (finding plaintiff lacked timely access to administrative record).

Though the court has recognized exceptions to the doctrine, there are established limits, especially as to the issue now before the court.  In Bethlehem Steel Corp. v. United States, 1988 WL 731602, *5 (Ct. Int'l Trade Oct. 14, 1998), where Commerce was required by statute, under 19 U.S.C. § 1677m(g), to permit the parties a "reasonable time" to respond to a submission, and the agency allowed a party only two days to respond, the court concluded that, "[b]y failing to protest at the time of its response, [the party] failed to exhaust its

administrative remedies within the meaning of 28 U.S.C. § 2637(d) (1994).  Thus it cannot now claim that it had an inadequate opportunity to comment on the supplemental information." Bethlehem Steel, 1988 WL 731602, *5.  Where a party did express difficulty with the time permitted by the agency for response, the court has been more flexible in allowing non-exhausted claims.  See Al Tech Specialty Steel Corp. v. United States, 11 CIT 372, 378, 661 F. Supp. 1206, 1211 (1987) (allowing claims where request to agency for additional time went unanswered). Thus, it can be seen that failure to protest time limits before the agency is crucial to the survival of related claims.

As noted, Borden did not request additional time from the agency or raise a protest about the time Commerce allowed for comments from the parties either to the agency itself or in its initial response to the Remand Determination submitted to the court.  The court concludes that Borden has foregone its opportunity to protest the time allowed it.  To the extent Borden makes it, the court disallows that claim for failure to have exhausted administrative remedies.

Likewise, the court rejects Borden's defense, by way of reference to the short time period, of its failure to have exhausted its administrative remedies as to its selling expense

and customer category claims.  Borden does not, and on this
record could not, argue that the selling expense or customer
category issue was considered by the agency.  The court therefore
declines to hear those claims and proceeds to consider Borden's
remaining arguments.

**b.    Price Mean Comparisons**

In its effort to establish whether the data showed a <u>pattern</u>
of significant price differences, Commerce conducted a "skewness
test," stating that "average transaction prices must exhibit a
downward skewness with respect to allegedly targeted customers."
<u>Remand Determination</u>, at 16.  Where the difference between the
highest price among non-targeted customers and the median price
for all customers exceeded the difference between the highest
price among the set of customers defined as "frequently at the
bottom" and the median price, Commerce concluded that no
targeting had occurred.  <u>Plaintiffs' Comments</u>, at 7-8.

Borden objects that this methodology is "inappropriate"
because it

> relies heavily on the differences in distances between
> the comparison points (highest price to non-targeted
> and targeted customers) to the median, and therefore
> distorts the Department's analysis of Delverde's
> pricing practice for purposes of [the] skewness test.
> The results of such a "skewness test" will, in turn,

defeat any attempt to prove the existence of targeted dumping.

Plaintiffs' Comments, at 8-9.

The court finds no actual argument within this conclusory statement.  Borden provides no basis upon which the court could evaluate its claim.  Borden simply argues that the test is "inappropriate" because it does what it purports to do, because it makes comparisons it purports to make.  Borden has not argued that the skewness test, as developed and implemented by Commerce, would not in fact measure downward skewness.  Nor has Borden argued that a test for downward skewness would or could not establish the "pattern" required by the statute.  Most significantly, Borden has made no attempt to show how Commerce's methodology would preclude a finding of targeted dumping altogether.

## c.  **Other Methodological Arguments**

Borden's also makes two arguments based on hypotheticals in response to Commerce's Remand Determination.  Borden argues that Commerce's methodology i) would preclude a targeted dumping allegation against a single large customer and ii) would fail to account for customers who purchase only in certain months within the period of inquiry.  Although Borden refers to its data set in making these arguments, Borden itself casts these arguments as

hypothetical.[6]  Plaintiffs' Comments, at 3-7.  Borden has alleged

neither that Delverde has targeted a single large customer nor

that targeting has been overlooked in the group of allegedly

targeted customers due to high sales concentration within a few

months.  Moreover, Borden concedes that petitioners might have

alleged targeting against a single customer, Plaintiffs'

Comments, at 5, which the court reads as a concession that it has

not done so.

Because the court may not engage in abstract review, it

requires an actual case or controversy to hear any issue, U.S.

Const. art. III, § 2.  Here, the court would likely require an

allegation of targeting against a single, large customer or

against customers who purchase only in certain months in order to

determine whether the methodology is legal in such situations.

Even if no constitutional standing problem exists, the court

declines to reject a methodology based solely on hypothetical

applications beyond the administrative record. Commerce might

welcome Borden's arguments as suggestions for improvement or

refinement of its targeted dumping methodology as applied in

---

[6]    The abstract nature of these arguments is highlighted by
Borden's use of conditionals and the subjunctive.  See
Plaintiffs' Comments, at 5-6.

future cases,[7] but these do not provide a basis upon which the court could order a remand or any other relief on this record.

## II.  Level of Trade

Before remand, Delverde argued that Commerce, during Delverde's level of trade inquiry, unlawfully denied its request for a constructed export price ("CEP") offset, an adjustment to normal value which Delverde claimed would have led to a de minimis dumping margin.  The court remanded to Commerce to revise its level of trade analysis without recalculating constructed export price.  Borden I, at 1242.

No party contends that Commerce did not comply with the court's directions with regard to the level of trade adjustments. Commerce does complain that it could not recalculate CEP under the court's direction.  That is true.  The court found that it was improper to order a remand on that aspect of the original determination which was not challenged by the parties, where remand was opposed by both the domestic and foreign interests and Commerce asked for a remand at the last minute and did not explain its "error."  Id.

---

[7]     Commerce has not only "reserved the discretion to alter [its] methodology in future cases," Remand Determination, at 15, but, in response to comments by the parties at earlier stages of this inquiry, has also expressed a good faith willingness to do so as appropriate in future cases, see id. at 17-20.

The CEP calculation itself was final, and the court did not permit its reworking.  It is not appropriate for Commerce to seek reconsideration by means of new arguments in a remand determination; respondent must live with the results of its choices as well.  There are rules which govern both the issuance of final determinations and the litigation of cases, and the court and parties must abide by them.  Finality is an important aspect of the unfair trade laws.  It is served by both exhaustion rules and limitations on remand.

Accordingly, the court affirms all aspects of the Remand Determination addressed herein.


_____
Jane A. Restani
Judge


Dated:    New York, New York

          This 4th day of June, 1999.